**UNITED STATES of America,**
**Appellee,**

v.

**Joseph S. DE VIVO, Appellant.**

**No. 394, Docket 24638.**

United States Court of Appeals
Second Circuit.

Argued June 4, 1957.

Decided July 9, 1957.

Douglas P. Null, New York City, for appellant.

Paul W. Williams, U. S. Atty., for the Southern Dist. of New York, New York City (Robert W. Bjork and Robert Kirtland, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before MEDINA, LUMBARD and WATERMAN, Circuit Judges.

MEDINA, Circuit Judge.

Joseph S. DeVivo was found guilty by a jury on two counts of an indictment charging him with the substantive offense of possession of stolen merchandise with knowledge of the fact that it was stolen (Count 2) and with conspiracy to steal goods from a truck moving in interstate commerce (Count 3), in violation of 18 U.S.C. §§ 371 and 659; and he appeals from the judgment of conviction entered upon the verdict and from the two four-year concurrent sentences imposed upon him by Judge Weinfeld.

There is direct and uncontroverted evidence that on October 17, 1956, a large aluminum trailer truck containing 1787 cases of Vitalis Hair Tonic left the Bristol Laboratories, Inc. in Syracuse, New York, on its way in interstate commerce to the Bristol-Myers Company plant at Hillside, New Jersey. This trailer truck was, during the morning of October 18, 1956, parked at Pier 26, North River, New York City, stolen and driven away that same morning and later found abandoned in the Bronx.

When the FBI closed in and made arrests on November 6, 1956 the stolen merchandise was found stored in the basement of premises owned by Mrs. Marguerite Schaefer at 3872 Boston Road, Bronx County, New York, not far from the place where the trailer truck was recovered.

A reversal of the judgment is sought because of the alleged insufficiency of the evidence to warrant the submission of the case against appellant on either the conspiracy count or on the one charging the substantive offense. It is also claimed that it was substantial and prejudicial error to receive the testimony of one Mucchiello over the objection of defense counsel. We find no merit in either of these contentions.

A recital of the sequence of events in chronological order will, we think, serve to clarify the simple issues involved and demonstrate the sufficiency of the evidence to sustain the conviction of appellant on both counts.

The Onondaga Freight Corporation was the carrier, and it had a small office at 79 Laight Street, New York City, three blocks from Pier 26, North River. At this office information was received of the forthcoming arrival of trucks from Syracuse and elsewhere and the necessary instructions for parking, routing and changing drivers were issued from this office. Sometimes the waybills were pushed under the door of this office and data concerning truck arrivals and other particulars were regularly received at this office over a teletype machine and these messages were hung on the wall of the office. A message concerning the arrival of the interstate shipment of Vitalis from Syracuse, showing the number of the trailer (234), its origin and destination, was received and posted in this manner at the Onondaga office and hangers-on or those seeking such information for illicit purposes had access to this message.

Truck drivers congregated in the vicinity and two in particular, Sam Perrone and Anthony J. Potenza were seen on numerous occasions in and about the premises prior to October 18, 1956 by the terminal manager of Onondaga, who testified at the trial. Another Onondaga employee testified that he saw Perrone looking at the teletype on a prior occasion and told him to stop. After the theft, and in the afternoon of October 18, 1956, Perrone and Potenza were observed unloading the stolen cases of Vitalis from the truck at Mrs. Schaefer's premises.

There is, of course, no direct proof that those charged in the indictment (DeVivo, Pagano, Perrone and Potenza) observed the Onondaga operations and conspired to steal one of the trucks. But the essential data for such an undertaking were available to Perrone and Potenza, who became so obviously involved, by fingerprints and otherwise, that they and Pagano pleaded guilty to the second count of the indictment before the trial was over. The first count, charging the theft, was dismissed against all but Pagano.

On October 15, 1956, two days before the theft of the truck and its contents, John A. Pagano, using the assumed name "John Browitz," appeared at Mrs. Schaefer's premises and after some discussion rented the store in the basement, which was partly hidden by trees and shrubbery, as shown in one of the photographs in evidence, telling Mrs. Schaefer that he wanted the place "for storage and then probably later a restaurant." We shall see shortly that Pagano is the man who stole the loaded truck on the morning of October 18. A day or two after October 15 Mrs. Schaefer saw appellant DeVivo and Pagano together on her premises. As Pagano stole the truck on October 18 and Perrone and Potenza were observed that very afternoon unloading the cases of Vitalis and carrying them into the basement that Pagano had rented from Mrs. Schaefer on October 15, it requires little argument to demonstrate that there was a conspiracy on foot to steal the truck and appropriate its contents. If, as we shall see, there is satisfactory evidence connecting DeVivo with this illegal transaction, there was

basis for an inference by the jury that Pagano in anticipation of the theft, had rented the basement to store the loot, and that DeVivo came out with Pagano on October 16 or 17 to inspect the location to see whether it was suitable for their purposes.

On October 18, a short time after the truck had been parked at Pier 26 Pagano arrived, told the man in charge of the parking space, "I am taking Onondaga 234," which he proceeded to drive off. Putting two and two together, it was not, we think, an unwarranted inference, under the circumstances above described, that Perrone and Potenza had ascertained that this loaded truck, Onondaga 234, whose destination was Hillside, New Jersey, would arrive when it did arrive, and that this information was passed along to the other co-conspirators, including Pagano, in order to carry out the plan and take the merchandise to the place in the Bronx that had been hired for the purpose.

In the short interval between the lease of the basement on October 15 and the arrest of appellant and Pagano on November 6 Mrs. Schaefer saw appellant in and around her premises on at least seven or eight occasions, repeatedly in the company of Pagano who had introduced appellant as his "friend." But, after the arrest, appellant told the FBI men that he had only been at the house on Boston Road on two prior occasions, once two weeks earlier and again on a single occasion about a year previously. He said he had come to rent a room and had no knowledge of the theft or storage of the Vitalis.

In the latter part of October Mrs. Schaefer suspected trouble and told Pagano to vacate the store; she became more insistent after what happened on November 4, which is of crucial significance, both as establishing the participation of appellant in the conspiracy and as proof of aiding and abetting and of his dominion and control, together with Pagano and the others, of the Vitalis stored at Mrs. Schaefer's place sufficient to sustain appellant's conviction on the substantive count charging possession of the stolen goods with knowledge that they were stolen.

The scene shifts to the evening of November 4, at a junk yard in Newark, New Jersey, where we find Pagano and appellant with a quantity of sundry drug supplies, consisting of shaving cream, Q-tips, talcum powder, hair tonic, shampoo, tooth paste and so on. According to the testimony of Mucchiello, which was received over objection, Pagano and appellant made a deal with him "to take the stuff over to the Bronx." An effort was made by the prosecution to prove that these drug supplies had been stolen, but the trial judge ruled this out. Although the Government maintains that such evidence should have been admitted, we have no occasion to consider the point. In any event, the trial judge's instructions on the subject were more than adequate to prevent any prejudice to appellant with respect to any inferences which might be drawn from the fact or even the possibility that these drug supplies had been stolen.

The significance of Mucchiello's testimony lies in the instructions he was given by Pagano and appellant and in appellant's conduct after Mucchiello arrived in the vicinity of the place where the Vitalis was stored. Pagano and appellant did not instruct Mucchiello to take the drug supplies in his truck directly to Mrs. Schaefer's place; they did not even give him her address. But either Pagano or appellant, in the other's presence, wrote a note, with the words "Gun Hill Road and Boston Post Road" and the telephone number "Tulip 2–9777," which was the pay telephone at Mrs. Schaefer's. Accordingly, Mucchiello proceeded to Gun Hill Road and Boston Post Road, called up the number he had been given; and about five minutes later Pagano and appellant arrived in an automobile. Pagano got in the truck with Mucchiello, and appellant led the cavalcade to Mrs. Schaefer's place, a few blocks away.

Pagano asked Mrs. Schaefer "if he could use a room upstairs to case some goods for a couple of hours," she acquiesced, the drug supplies were unloaded, and, before returning to Newark,

Mucchiello told Pagano he had noticed a suspicious looking Nash in the neighborhood, but Pagano passed this off. A number of unidentified men were in the room where the drug supplies had been taken, and Mrs. Schaefer outside the room heard someone say "There's a suspicious looking Nash," and "it looks like the law."

Events moved swiftly thereafter. Mrs. Schaefer insisted that all the "stuff" be taken away; there was much telephoning back and forth; a truck was coming and then it was not; and, in the midst of all this, on November 6, Pagano and appellant arrived and were taken into custody.

We think the evidence of appellant's participation in the conspiracy too clear for further discussion. Viewing appellant's conduct in the setting above related we also hold that there was adequate proof to justify the submission of the substantive count to the jury.

As to Mucchiello's testimony, we think this was relevant and of considerable probative force on the issue of whether appellant exercised dominion and control over the stolen goods or aided others in the exercise of such dominion and control.

Affirmed.